## ARCHIBALD GRAHAM v. JANE HOUGHTALIN ET AL.

1. A deed was made, on the 31st August, 1810, by G. G. to D. and E. his wife, conveying to the said D. and wife the premises in question for and during their natural lives, and the life of the survivor of them, and after their decease, to the children of the said D. by his said wife, and to their heirs and assigns for ever.
2. *Held*, that the remainder vested in the children living at the date of the deed, subject to open to let in after-born children.
3. On the 15th of June, 1818, the said D. and his wife were still living, and had then six minor children, and afterwards had two more born. On the said 15th June, D., as the guardian by nature of his children, obtained a decree of the Orphans Court of Essex to sell the said lands for the support of said minors.
4. In an action of ejectment, brought by the children against the purchaser, after the death of D. and wife, *held* that the two children born after the sale were not affected by it.
5. *Held further*, that the other children, being minors, and not orphans, at the time of the decree for sale by the Orphans Court, were not bound by the decree; that the Orphans Court had no jurisdiction over

the subject matter, and that a sale under the decree was void, and conveyed no title.

6. By the term guardian, in the 6th section of the act of 1799, *Rev. Laws,* is meant such guardians as are named in the previous sections of the act.

7. A minor who is seized of a remainder in fee expectant upon the death of his father, who has a life estate therein, cannot be a ward in socage, nor can his father be his guardian in socage.

8. The father, who is guardian by nature only, and not appointed by any court or competent authority, is not a guardian within the meaning of the phrase "other guardian," named in the 3d section of the said act of 1799 respecting guardians.

9. A father, as guardian by nature, is not appointed; it results to him by operation of law.

10. A guardian by nature is guardian of the person only, and not of the estate.

Error to Supreme Court.

This was an action of ejectment, brought by the defendants in error against the plaintiff, in error, in the Supreme Court, to recover possession of a parcel of land, containing 9.83 acres, in the city of Paterson. The suit was commenced on the 30th November, 1861. The defendant pleaded the general issue, and the cause was tried in April, 1862, at the Circuit Court in the county of Passaic, before his Honor Justice Ogden.

The plaintiff offered in evidence—

1. A deed, from Richard Van Gieson and Jane his wife, dated 31st August, 1810, to Henry Doremus and Elizabeth Doremus his wife, (the said Elizabeth being a daughter of the said grantors) by which the said grantors, for and in consideration of the love they have and bear for and unto their daughter Elizabeth, wife of the said Henry G. Doremus, and for the consideration of one dollar, granted and sold to the said Henry and Elizabeth Doremus, for and during the term of their natural life and the life of the survivor of them, and after their decease to the children of the said Henry G. Doremus by his said wife Elizabeth, and to their heirs and assigns for ever, certain parcels of land, including the premises in

question. The *habendum* clause in the deed corresponded with the term of the grant. This deed was duly acknowledged and recorded.

The plaintiff then proved—

That Henry G. Doremus died in 1837, and Elizabeth Doremus died in 1861, and that all the plaintiffs, except James Fox, were children of the said Henry and Elizabeth, five of them having been born after the execution of said deed, and that the defendant was in possession of the premises.

The defendant offered in evidence—

1. An order of the Orphans Court of Essex county, made June, 1818, authorizing Henry G. Doremus, as guardian of the persons and estates of Jane, Henry, Josiah, Eliza, George, and Richard Doremus, his children, minors under the age of twenty-one years, to sell all the real estate of the said infants, for and towards their maintenance and education, they having no personal estate, and the rents and profits of the said real estate being insufficient to maintain them.

2. A certified copy of a report of sale, made by the guardian to Abraham Ryerson, of the lot in question, on the 8th November, 1819, for five hundred dollars.

3. A deed from said Henry G. Doremus to said Ryerson for said premises, dated December 6th, 1819, which deed sets out the order of the Orphans Court, and the sale made in pursuance of it, and was afterwards acknowledged and recorded.

4. A deed from Abraham Ryerson to Henry G. Doremus, for the same premises in fee, for the consideration of five hundred dollars, dated December 6th, 1819, and recorded on the 7th of December.

5. A certified record of a decree of the Court of Chancery, on a foreclosure suit upon a mortgage given by said Henry G. Doremus to Aaron A. Van Houten, for the sum of eight hundred and fifty dollars, dated November 17th, 1819, in which suit the said Aaron A. Van Houten was complainant, and Henry G. Doremus and wife defendants, and which

decree bears date January 7th, 1821, and is for the sum of $919.42, and also a copy of the execution issued on said decree.

6. A deed from Joseph T. Baldwin, sheriff of the county of Essex, dated July 20th, 1821, to Daniel Holsman for the said premises, consideration $1035.33.

The defendant then proved that he had been in possession of the premises, as tenant under Daniel Holsman and his heirs, since 1832; that Holsman, when he bought, supposed he was buying a good title; that it was publicly known that Henry G. Doremus, in addition to his life estate, had got the title of the heirs by proceedings in the Orphans Court; that at the time of the sale by the guardian, $500 would have been considered a fair price for the remainder expectant on the death of Henry G. Doremus and his wife; that the regularity or *bona fides* of the sale was not called in question until many years after it was made, and that the said Doremus was poor and improvident.

The plaintiffs then further offered in evidence—

1. An account of Henry G. Doremus, guardian of Henry, Josiah, Eliza, George, Richard, and Jane Doremus, for maintenance and education, exhibited to the Orphans Court of Essex county, June 15th, 1818, amounting to $1764.

2. A bond purporting to be a guardianship bond given by Henry G. Doremus and Helmagh R. Van Houten to the Ordinary of the state, in the penal sum of $1250, dated June 15th, 1818, and with a condition as follows: "The condition of the above obligation is such, that if the above bound Henry G. Doremus, as father and natural guardian of Jane, Henry, Josiah, Eliza, George, and Richard, his children, shall take due and proper care of whatever property, whether real or personal, of his said children, which hath or may come to his hands, and make no waste thereof or destruction therein, and render to them, when of full age, a just and true account thereof, and pay over whatever may be in his hands, then this obligation to be void."

3. A certificate of the surrogate of Essex, dated 1862, to the effect that he had searched, from 1810 to the present

time, and could find no other paper in his office in relation to the guardianship of children of Henry G. Doremus, nor any order for the appointment of a guardian.

The plaintiffs also called witnesses to show that the children of said Doremus, when minors, worked in the mills at Paterson for wages, and earned money—some two or three dollars a week,—this was between 1815 and 1822.

The evidence having been closed, the plaintiff's counsel contended—that the deed given by Henry G. Doremus to Abraham Ryerson was a nullity, because it did not appear he was guardian of his children, and no order of sale could be made by the Orphans Court in such case; that according to the evidence, the deed from Doremus to Ryerson, and the deed from Ryerson back again to Doremus, were fraudulent and void.

The defendants' counsel contended, and called upon the court to charge, that the decree of the Orphans Court was evidence of the facts recited therein, except the fact of Henry G. Doremus being guardian of his children.  They also asked the judge to charge that none of the children born after the execution of the original deed from Van Gieson and wife to Henry G. Doremus and Elizabeth his wife were interested in the remainder created by said deed.  They also called on the judge to charge that the sale by the guardian could not be attacked for fraud in a trial at law, but only in a court of equity; but if he should refuse so to charge, then they asked him to charge, that there was no evidence before the jury from which they could infer fraud in said sale; and at all events, as there was no evidence to charge Daniel Holsman with any knowledge of fraud in the guardian's sale, he was not affected by it, if any had been committed.

The judge charged the jury, for the purposes of the trial, that the Orphans Court had jurisdiction to make the order of sale, and that said order could not be attacked in this collateral way.

He further charged, that the question of fraud in the sale by Doremus, as guardian, might be inquired of in a trial at

law for the purpose of avoiding such sale, and that there was evidence from which, if it would sustain them, the jury might infer that the sale by Doremus, as guardian, to Ryerson, was a legal fraud upon the children, and therefore void as to them; and that Holsman stood in no better situation than Doremus did, but was bound to inquire and ascertain the facts before he purchased. And on the question of fraud, the judge charged the jury, that they had a right to look at the fact, that the deeds from Doremus and Ryerson were of the same date; and that they had a right to look at the guardian's account, as filed in the Orphans Court, and at Doremus' poverty, as an inducement for fraudulent conduct. The judge also charged, that all the children of Henry G. Doremus and Elizabeth his wife were interested in the remainder created by the deed.

To the matters so charged, and each of them, except as to the jurisdiction of the Orphans Court, the defendants' counsel excepted, and prayed a bill of exceptions, which was allowed and sealed accordingly.

Upon the coming in of the *postea*, judgment for the plaintiffs was entered upon the verdict found by the jury, and thereupon the defendant brought his writ of error into this court, and assigned for error, that the charge of the judge was erroneous in the several matters excepted to as above stated.

For plaintiff in error, *J. Hopper* and *J. P. Bradley*.

For defendant, *D. Barkalow* and *A. S. Pennington*.

VREDENBURGH, J. This is an ejectment, brought by Doremus and others, to recover a lot of 9.83 acres, in the city of Paterson. The plaintiffs claim title, under a deed dated the 31st of August, 1810, from Richard Van Gieson to Henry G. Doremus and Elizabeth his wife, whereby the grantor conveyed to the said Doremus and wife the premises in question for and during the term of their natural life, and the

Graham v. Houghtalin.

life of the survivor of them, and after their decease to the children of the said Doremus by his said wife, and to their heirs and assigns for ever.

The plaintiffs are the children of the said Doremus and wife. Mrs. Doremus survived her husband, and died in 1861. This gives a perfect *prima facie* title to the plaintiffs. Although only two of the plaintiffs were born at the date of this deed, yet it is manifest that the deed vested the remainder in the children then born, subject to be opened at the birth of each succeeding child, so as to let them in equally as they were born. The plaintiffs therefore, by virtue of the remainder vested in them by this deed, were entitled, at the death of their mother, in 1861, to recover the possession, unless the defendant shows a better title.

The defendant sets up, as such better title, a decree of the Orphans Court of the county of Essex, dated on the fifteenth day of June, 1818, ordering Henry G. Doremus, the father of the plaintiffs, to sell this land for the support of such of the plaintiffs as were then born; also the proceedings on said decree, and a sale and deed under it, to the defendant's grantors. The question is, whether these proceedings in the Orphans Court, and the sale and deed under them, transferred the title of the plaintiffs to the defendant. As to the title of Rachel Ann Fox and John Doremus, two of the plaintiffs, who were born after this order of the Orphans Court, it is clear that their title did not pass, because the title of the children who were born before the decree of the Orphans Court was subject to be divested to the extent that there might be afterborn children, and was actually divested by the birth of these two children, and became vested, to that extent in them. The estate of such afterborn children was not, and could not therefore have been affected by the proceedings in the Orphans Court, consequently the said Rachel Ann Fox and John Doremus, to the extent of one-eighth each, are entitled to recover, even if the proceedings and sale under the Orphans Court are valid.

The next question is, whether the other six-eighths passed

by the proceedings in the Orphans Court. The first question raised by the plaintiffs in regard to these is, whether the Orphans Court had jurisdiction of the subject matter. This decree of the Orphans Court is dated on the 15th of June, 1818, and recites, that whereas Henry G. Doremus, guardian of the person and estate of Jane, Henry, Sophia, Eliza, George, and Richard Doremus, minors, under the age of twenty-one, hath satisfactorily shown to the court that the said minors have no personal estate, and that the rents, &c., of the real estate are not sufficient for their maintenance and education, and do therefore, agreeably to the act of the legislature in such case made and provided, further adjudge and decree that the said guardian sell all the real estate of said infants.

On the 7th December, 1819, the guardian reported that, in pursuance of said order, he had sold the premises in question, for $500, to Abraham Ryerson, under whom the defendant held. Had the Orphans Court of the county of Essex, on the 15th day of June, 1818, any power to order this sale? Had they jurisdiction over the subject matter? The subject matter is the sale of the real estate, not of orphans, but of the minor children of Henry G. Doremus. The authority under which it is contended that the Orphans Court had power to sell these lands, in the sixth section of the act, passed on the first day of February, 1799, *Pat. Laws* 347, which was the act in force when these proceedings in the Orphans Court were had. This section reads as follows: "That if the personal estate, and rents and profits of the real estate, be not sufficient for the maintenance and education of the ward, the Orphans Court of the proper county, on full investigation thereof, may from time to time order the guardian to sell such parts of the ward's lands, tenements, hereditaments, and real estate as they shall direct and judge adequate for his or her maintenance and education." So that it will be perceived that the act did not give power to the Orphans Court to sell the lands of everybody, but only the lands of wards by guardians. Were the plain-

tiffs, when, these proceedings were had, wards within the meaning of this act? If they were not, the Orphans Court had no jurisdiction whatever of the subject matter.

The act is entitled "an act relative to guardians."

It has never been supposed, by anybody, that this act was intended to embrace all kinds of guardians or all kinds of wards; that it embraced guardians *ad litem*, guardians for nurture, or guardians for lunatics or idiots; nor were the lands of such wards ever attempted to be sold under it. When guardians and wards were spoken of in common parlance, the parties meant guardians appointed by the Ordinary and Orphans Court as his wards. However obtained, the Ordinary, long before this act was passed, had exercised the power of appointing guardians of orphans, but his power was confined to that; he never pretended to interfere with the property or custody of infants who were not orphans. The ecclesiastical courts of England never attempted to interfere with infants who were not orphans, either as to their persons or estates; and if they had, they would very soon have found themselves brought up in the Court of Chancery. But in this state, the Ordinary always exercised jurisdiction over orphans, so far as to appoint guardians over their persons and estates, and to call such guardians to account and settlement.

At the time of the passage of this act in 1799, the Ordinary, in analogy to the ecclesiastical courts of England, had jurisdiction over the probate of wills, granting letters of administration and the settlement of accounts and orders of distribution, and the power, however obtained, as we have before stated, over the persons and estates of orphans. These were cognate subjects, relating to the estates of deceased persons; but the estate of a minor who was not an orphan was a subject altogether foreign to the jurisdiction of the ecclesiastical courts of England, as well as to the jurisdiction of the Ordinary here. As to the minor who was not an orphan, his rights were always, in England as well as in this state, under the supervision of chancery alone. This

being the condition of the law in this regard, at and for a long time before this statute relating to guardians was passed in 1799, let us see what legislation had been had affecting this subject. The first legislation in this state affecting this matter was the act of 1784. At this time it was inconvenient and unsatisfactory for the people to be obliged to settle their accounts, as executors, administrators, and guardians, in the Prerogative Court; and this act of 1784 was passed, not to include in its operations, matters of jurisdiction not before vested in the Ordinary, but to divide his jurisdiction between him and the Orphans Court, in order to afford greater facilities of doing it. The first mention of an Orphans Court in this state is the said act of the 16th December, 1784. *Pat. Laws* 135. The act is entitled "an act to ascertain the power and authority of the Ordinary and his surrogates, to regulate the jurisdiction of the Prerogative Court, and to establish an Orphans Court in the several counties of this state." The preamble reads as follows: "Whereas, it is necessary that the power and authority of the Ordinary and his surrogates should be defined, the jurisdiction of the Prerogative Court regulated, and an Orphans Court established in the several counties of this state—therefore be it enacted, that from and after the passing of this act, the authority of the Ordinary shall extend *only* to the granting of probates of wills, letters of administration, letters of guardianship, and marriage licenses, and to the hearing and finally determining all disputes that may arise thereon." It then prescribes the time of holding the Prerogative Court. The act then enacts, that there shall be an Orphans Court in each county, which shall hear all disputes respecting the existence of wills, the fairness of inventories, the right of administration, and the allowance of accounts of executors, administrators, guardians, and trustees, audited and stated by the surrogate, and such other powers as are given by the act. It is apparent, from this act, that by it, the legislature did not intend to give to the Ordinary or the Orphans Court jurisdiction over classes of individuals over

which the Ordinary had not jurisdiction before, but to divide that power between the Ordinary and the Orphans Court. It limited the power of the Ordinary over certain matters, which it had previously, and gave it to the Orphans Court, with right of appeal. But the two courts, together, had jurisdiction over the same classes of individuals after the act, that the Ordinary had before. The name and idea of the Orphans Court were borrowed not from the English ecclesiastical courts, but from a court called the Court of Orphans, for a long time established in London and some of the other large cities of England, and which, as its name imports, had jurisdiction over the estates and persons of orphans only. So far as regarded decedents' estates, generally, the act gave the Orphans Court the same jurisdiction as the Prerogative Court, borrowed from the English ecclesiastical courts, had over executors and administrators; and so far as orphans were concerned, it gave the Orphans Court the same jurisdiction the Ordinary had, and which, so far as the Orphans Court was concerned, was borrowed from the Court of Orphans of the city of London; but so far as minors who were not orphans were concerned, neither the Prerogative Court or Ordinary in this state, or the ecclesiastical courts of England, or the Orphans Court of the city of London, had power to meddle with their persons or estates. Minors who were not orphans, were always foreign to the power and jurisdiction of all these courts. It is apparent, upon every line of this statute, that when it speaks of guardians and wards, it means only guardians of orphans; and when it speaks of wards, it means orphans only. So palpable is this, that we find the words minors and orphans used as synonymous throughout the act.

The 18th section of the act of 1784 provides how the letters of guardianship shall be obtained and issued by the Ordinary, but it provides for orphans only; showing that the legislature did not understand that the Ordinary or the Orphans Court had any power over minors who were not orphans. The 11th and 12th sections of the act of 1784 authorized the court to sell the lands of orphans, only for sup-

port and maintenance. Such was the condition of the law when this act we are considering, of 1799, was passed. Did this act of 1799 intend to extend the power of the Orphans Court over classes of individuals not before within the jurisdiction of either the Ordinary or the Orphans Court, further than it is expressly named therein? It is entitled " an act relative to guardians." If nothing had been said in the act with respect to what guardians were meant, we should infer that it had regard only to such guardians as were referred to in the act of 1784, *viz.* those of orphans and those appointed by the Ordinary or the Orphans Court.

Let us now examine the language of this act itself. It was passed in 1799. These proceedings for sale were had under it in 1818. To appreciate the language of the act accurately, we must carry ourselves back to 1799, live among and breathe, as it were, the air and customs of that age. The defendant contends that the father is a guardian, and his children such wards as is meant in the 6th section of the act of 1799. The language of this 6th section, as we have seen, is—if the rents of the estate be not sufficient for the maintenance of the wards, the court may order the guardian to sell it. The section does not say what kind of ward or guardian is meant; but the presumption is, that this section means such individuals as were the wards of such guardians as had been previously named in the act. We must therefore, from necessity, resort to the previous provisions of the act to ascertain what kind of guardians and wards are meant. The first section provides that every guardian appointed by will shall appear before the Orphans Court, and give bond. But such kind of a ward must necessarily be an orphan, for no one can create a testamentary guardian but the father, and he must be dead before his will appointing a guardian can go into effect. So far, therefore, as the first section of the act is concerned, it clearly authorizes the sale of lands of orphan wards only. Let us now examine the second section of the act. This provides that every court, or other competent authority appointing a guar-

dian shall take bond. But the father was never appointed
by any court or other competent authority, within the mean-
ing of this section. The competent authority, under which
the father acted as the guardian of his minor children, was
the broad seal of God and nature, and it is not to be pre-
sumed that this is the kind of competent authority spoken
of in this section. The court or other competent authority
spoken of in this section is, obviously, the Chancellor, the
Orphans Court, and the Ordinary, or his surrogates. The
legislature use this peculiar language, "court or competent
authority," for two reasons—1st, because, upon the face of
the act of 1784, then in force, it was doubtful, in some cases,
whether the appointment was made by the Orphans Court or
the Ordinary; and 2d, because it was doubtful if the Ordi-
nary and his surrogates might be deemed a court. But the
father was never appointed guardian by any court or any
authority whatever, and could not have been until the pas-
sage of our act, for the first time in 1843. Until then, the
jurisdiction of all courts to appoint, even of the Lord High
Chancellor himself, arose only upon the death of the father,
and in the case of orphans.

Let us now proceed to examine the 3d section of this act,
and see if that refers to any other guardians, except those
of orphans. It provides that every testamentary guardian,
guardian in socage, or other guardian, shall, within three
months after his acceptance of appointment to his office, de-
liver an inventory and account in the Orphans Court. Now,
in the first place, in the absence of all language showing a
contrary intent, the presumption is that this mandate has
reference only to the kind of guardians referred to in the
first two sections—to only those required by them to give
bond. It is the obvious intent of the act to require the Or-
phans Court to take bond from all kinds of guardians, over
which it intended to give the Orphans Court jurisdiction.
This is manifest, further, by the special language of the sec-
tion. It says, every guardian, within three months after his
acceptance or appointment to his office, shall account, &c.
So that the section only speaks of guardians who accept of

or are appointed to the office. Now this is true of the guardians spoken of in the first two sections; the testamentary guardian is appointed by will, and is not guardian until he accepts. The guardian in socage accepts, if he sees fit. All other guardians named in the first two sections are appointed by the courts. But the father neither accepts or is appointed as guardian of his minor children. Their guardianship is thrown upon him by the mere operation of law, and he is not at liberty to refuse it; and therefore this kind of guardianship is matter neither of acceptance or appointment. The section speaks of guardians, only, who accept or are appointed. This is true of all kinds of guardianship except that of the father to his minor children, or of guardian for nurture, but is not, and cannot be true of them.

But let us consider the terms of this section more specifically. The first kind of guardian named in it, is the testamentary guardian. These, we have shown, must necessarily have been guardians of orphans only. The next kind of guardians named are guardians in socage. Was the father guardian in socage? were his children wards in socage? These plaintiffs were not tenants in any sense of the word socage or otherwise. They had an estate in remainder. The tenants in socage, if any there were, were the father and mother, not the children. There could, from the nature of things, be no guardian in socage while the land was held by the tenant for life. Guardianship in socage results by reason of the orphans being tenants in socage. These children were not tenants; they did not hold the land, while the father and mother held it by virtue of their life estates. In all tenures in socage those who are bound to pay the rent or render the service are and can be the only tenants in socage. One not bound to pay the rent, or render the stated services, could not, from the nature of things, be tenant in socage. The guardian in socage is one who takes possession of land for the benefit of the minor. Where there is no land which the guardian can take possession of for the benefit of the minor, there can be, from the nature of things, no guardian

in socage. The orphan remainderman can be no tenant in socage, nor can any guardianship in socage result therefrom. The guardianship in socage results, by operation of law, out of an existing tenancy in socage, and when the present profits flow not to the father, but to the orphan. When the present profits flow to the father, he is bound to pay the services, and therefore he is the tenant in socage, and not the child.

The only remaining phrase in this act, that could by possibility have reference to the case before the court, is the phrase in the 3d section, " other guardian." This section says, " testamentary guardian, guardian in socage, or other guardian."

The defendant contends that the father of these plaintiffs was guardian by nature, and therefore within the meaning of the phrase " other guardian." Mr. Doremus, the father of these plaintiffs, was not, as we have seen, either the testamentary guardian or the guardian in socage of the plaintiffs. He was not a guardian appointed by any court or competent authority. He was not appointed by the Ordinary, or the Orphans Court, or by the Chancellor.

This is manifest from two considerations : first, because in his bond filed with the Ordinary, he calls himself the natural guardian, which excludes the idea of appointment ; second, because neither the Ordinary, the Orphans Court, or the Chancellor himself, has any power to appoint him. He took as guardian by nature, not by appointment of any tribunal at all, but it resulted to him by operation of the law of nature. The father is always, upon the birth of every child, whether he has property or not, guardian by nature. But the question here is, is a guardian by nature such a guardian as is meant by the phrase " other guardian," in the 3d section of this act of 1799.

Now it is apparent, from all the sections of this act, that it had no reference to any such guardian, any more than to guardian for nurture, guardian *ad litem*, guardians of idiots or lunatics, or guardians of the public peace.

In the first place, guardian by nature is guardian of the

person only of his child, and not of his estate. When a child, in the lifetime of its father, becomes vested with personal property, no one is strictly entitled to take it as a guardian, until a guardian has been duly appointed by some public authority. 2 *Kent* 244; 1 *P. Wms.* 285.* Now all the sections, and every line of this act of 1799, have reference only to guardians who have the custody of the property of their wards. The father can neither be appointed by the Ordinary or Orphans Court, or give bond. Can we suppose that the legislature should take bond from a guardian who has no custody of, and is not responsible for the property? The guardian for nurture or by nature might as well give bond for all the property of the ward.

In the next place, the guardians spoken of in the act are required to file an inventory under oath. Now this applies to guardians by appointment, but how is it possible for the guardian who has nothing to do with the property to do it? The guardian named by the statute is to account every year, or oftener, for what comes to his hands. How is the guardian by nature to do this when nothing comes at all? Again, section 4th provides that any guaadian who shall not deliver an inventory or render an account, shall be made to perform his duty or be displaced. How is a guardian who has nothing to do with the property to do this? or how is the Ordinary or Orphans Court to displace the father as guardian by nature.

The Chancellor of England has refused to displace the father when, as guardian in socage, he had the custody of the ward's socage lands, and said that he would protect the ward by appointing some one to act in the name of the father, but he would not take the child from the custody of the parent or deprive him of his guardianship by nature.

Again, in the 5th section, it is provided, that the Orphans Court, when they shall have reason to suspect that the sureties of a guardian are in failing circumstances, may compel the guardian to give additional security, and if he fail may displace him. It is apparent here again, that the only guardians spoken of are those appointed and who

* *Dagley* v. *Tolferry.*

give security. This could not be the father; for he is not appointed, and therefore he not only cannot give security, but not having the custody of the estate, there is nothing for him to give security for. These are all the kinds of guardians named in the act of 1799, and as none of them can apply to guardians by nature or to their wards, it follows that the Orphans Court had no power to order this sale.

But again, this very 6th section of the act of 1799 shows upon its face, that it was never intended to apply to guardians by nature, but only to orphans who have somebody for guardians, who are not bound to support and maintain them.

The father, by all laws human and divine, is bound to maintain and educate his child. This 6th section, if it includes the father and his minor children, would reverse the whole order of nature and all human laws that were ever before passed. It takes from the father the duty to maintain and educate the child, and puts these obligations on the child itself. Such could not have been the intent of the law. When the father is dead, and the orphans are thrown on strangers, it is right and proper that the property of the child should be used to that end; and that was all the act of 1799, which was merely passed to make more intelligible the act of 1784, was intended, in this regard, to effect.

There are some cases reported, when the minor is very rich, and the father poor, where Chancery has allowed the parent a reasonable sum for maintenance out of the child's estate, but this is never more than to make his education to agree with his estate; but I have found no case where the Chancellor has allowed all a minor's estate to be sold for his education when the father is living. It is against the whole theory upon which such allowances are made. The allowances are made not to free the father from supporting the child, but that the child should be educated according to his estate, which, perhaps, the father could not afford to do.

It is apparent that the object of the act of 1799 was—1st, to require testamentary guardians, when the will does not provide otherwise, to give bond and account; 2d, to require

all guardians appointed by public authority, whether the Chancellor, Ordinary, or Orphans Court, to give bond and account; 3d, to require guardians in socage to account; 4th, to give the Orphans Court greater control over the guardians thus named; 5th, to prevent obscurity—the 10th and 12th sections of the act of 1784, authorizing the sales of the lands of orphans—and not to extend the jurisdiction of the Orphans Court over minors who were not orphans, over a new and distinct class of individuals, a class entirely foreign to the jurisdiction of all cognate tribunals.

Such has, I understand, always been the judicial construction of this statute. Thus, in April term, 1829, in the case of *Garrabrant* v. *Sigler*, 1 *Halst. Dig.* 507, § 6, Chancellor Williamson decided that the Orphans Court had no power to appoint a guardian for a minor during the lifetime of the father, and that the Prerogative Court had no such power, nor could the consent of the father confer such jurisdiction. Now how could this be so if the Ordinary or Orphans Court had jurisdiction over minors who were not orphans? Must not this decision have been founded upon the principle, that the Prerogative Court and the Orphans Court had jurisdiction only over orphans and their estates, and that minors not orphans, were matters entirely belonging to other jurisdictions? I regret much that this opinion of Governor Williamson has not found its way into our reports, as I have no doubt it would have thrown much light upon this obscure region of the law, and which, as Chancellor Pennington remarks in the matter of Coursen's will, 3 *Green's C. R.* 412, presents a wilderness of perplexity to the practitioner. The legislature, as I understand it, have also always put the same construction upon this act. This is manifest from the act of February 22d, 1843, *Penn.* 84, incorporated in the present act of 1846, *Nix. Dig.* 342, § 10,* which enacts, " that if any minor shall become seized of real estate in the lifetime of the father, it shall be lawful for the Ordinary or for the Orphans Court to appoint the father or other suitable person guardian ·

---

* *Rev., p.* 760, § 38.

of such estate." Does not this show that the legislature understood that, at the first passage of this act in 1843, it was considered that the estates of minor children who were not orphans, were a subject matter entirely foreign to the jurisdiction of the Ordinary and the Orphans Court, and that it was necessary to pass a special act to give them jurisdiction over such minors' estates.

But again, so early as 1825, *Elmer's Digest* 220, an act was passed entitled, " an act for the protection of the minor children of persons who abscond or absent themselves from this state," giving to the Orphans Court power to appoint guardians of such children in the same manner as guardians are now appointed by said court. This act, as it were, defines the act of 1799 as not including in the term guardian or ward, in that act, guardian by nature or a guardian of any ward who was not an orphan. The Circuit Court charged the jury, in this case, that the Orphans Court had jurisdiction. To this the defendant, of course, did not except.

The Circuit Court further charged, that the deed under this order might be impeached for fraud at law. The jury found for the plaintiff upon the question of fraud, and the defendant assigns this charge for error. Whether it was erroneous or not, depends entirely upon the question, whether the Orphans Court had jurisdiction. If they had, then it perhaps might have been erroneous for the court to charge that fraud could be inquired of at law; but if the Orphans Court had no jurisdiction, then it was a matter wholly immaterial whether the transactions attending the sale were fraudulent or not. The defendant had no more right to recover in the one case than in the other. If the Orphans Court had no jurisdiction, the defendant asked the court to charge matter wholly immaterial, and it was equally erroneous or equally lawful to charge the one way as the other. There could be no error in either case.

I think the judgment below should be affirmed.

VAN DYKE, J. I am not able to concur with the majority of the court in the conclusion to which they come.

The order of the Orphans Court, directing the guardian to sell the real estate of his wards, was held, in the Circuit Court, to be a valid order. This court determines to reverse and set aside that decision, and hold the order to be a nullity, although no objection was made at the trial to the offering of such order in evidence, nor was any exception taken to its admission when received. And although the defendants' counsel seem to have contended, after the evidence was closed, before either the court or the jury, or perhaps both, that the Orphans Court had no power to make such an order, yet when the court charged otherwise, that the order was good and valid, the plaintiffs do not seem to have taken any exception thereto, nor to have asked for the sealing of a bill of the kind. The case is now before us on exceptions to the charge of the judge, taken by the defendants' counsel. They prayed him to charge in a particular way, which he refused to do, but charged directly to the contrary. To this charging the one way, and refusing to charge the other, the defendants excepted, and obtained a bill of exceptions. On these exceptions, thus taken and sealed, the only errors before us are assigned. To these errors, so assigned, and to these alone, by a series of decisions quite unshaken, I think we are now confined. How it is, then, that this order of the Orphans Court, which forms no part of the record proper in this suit, which was only a part of the evidence in the case, which was received without objection, which is in the case as made, but not within any of the exceptions taken, and which the party against whom it was received has in no way brought before us, and on which no error is assigned—how it is, I say, that this court can in this way, and under such circumstances, make the making of this order and its destruction the great turning point in the case, not for the purpose of reversing the judgment and setting aside the verdict which has been rendered as prayed for, but for the support of both, and yet for the ruin of the defendants' case, is more, I must confess, than I can well understand. At all events, I cannot concur in such proceedings. It seems like the voluntary turning

aside to do that which no one asks us to do, and yet it is that which is fatal to one of the parties in the case.

But if this order were properly before us, I should be equally unable to concur in the disposition which has been made of it. This judgment of the Orphans Court is probably as solemn a one as it had power to render at the time. We are looking at it from a point of view purely collateral, and under such circumstances it is held by numerous authorities, and I think not denied by any one, that if the court had jurisdiction over the subject matter, as it is termed, with the right to make a decree in that kind of case, then the proceedings, even if clearly irregular and wrong, cannot be questioned in a collateral way; but if corrected at all, it must be by a direct appeal to the court itself where the proceedings were had, to correct the error, or by an appeal from it to some other tribunal having the power to reverse.

But it is said that the Orphans Court, in this case, had no jurisdiction over the subject matter. Now what is meant by a court having jurisdiction over a "subject matter?" It unquestionably means that the court has the right and power to act, and render a judgment or decree in that particular kind of case, or matter, or thing, either a right one or a wrong one. If it has no jurisdiction over the subject matter at all, then it has no power to render any judgment at all, either a right one or a wrong one. If it has the power to render a right judgment in this kind of case, then it has jurisdiction over the subject matter; and if it should render a very wrong one in such a case, it will be held good until it is directly reversed or set aside. And this is, perhaps, the best test to apply by way of settling the question. If a justice of the peace should take jurisdiction of, and render judgment in an action for slander, such judgment, no matter what kind of a one it might be, would be absolutely void, because he has no right to give a judgment at all of any kind. He has not jurisdiction of the subject matter, that is to say, he has no power to hear and determine that kind of thing at all, nor to touch it at all. But if he render judgment in an

action of debt for less than $100 without any evidence at all, it will be a wrong judgment; but it will be held good, when collaterally drawn in question, until it is reversed, because here he has jurisdiction over the subject matter, that is to say, he has jurisdiction in that kind of case and over that kind of thing, and has the right to give a judgment of some kind, either a right one or a wrong one. He had the right to touch the subject.

These principles are extended to almost, if not quite every species of tribunal, and very frequently to city authorities, in the passage of what are termed *judicial* ordinances; such ordinances, I mean, as require of the people, or some portion of them, to do some affirmative or positive act, such as the paving of the streets, and the like. In such cases, even if the law requires the city authorities, before passing such ordinance, to advertise their intention for a certain time, and in a certain way, or that the land owners should first petition for the passage of such ordinance, which would seem to be necessary to give the requisite jurisdiction; yet if they pass such ordinance without such previous advertisement or petition, if they had the power to pass that kind of ordinance, the courts have invariably refused to interfere with them in a collateral way, but have held them to be good until reversed in the proper manner.

What, then, was the subject matter which the Orphans Court, in this case, was called to act upon? It was simply an application to authorize or order a guardian to sell the real estate of his wards for their maintenance and education, their personal estate being insufficient for that purpose. Now can it be that this was not a subject matter or kind of thing over which the Orphans Court had jurisdiction, which they had no right to touch? Why, it is the very thing which the 6th section of the act of 1799 expressly authorizes them to do. That court certainly had jurisdiction over the application, and had the right either to grant it or refuse it, as the facts and circumstances should require, and their decision either way *might* have been perfectly right and perfectly

legal. This, I think, cannot be controverted. If, then, that court could lawfully receive and consider of such an application, and grant it, and make the order to sell under any circumstances, it must have been because they had jurisdiction over the subject matter, over that kind of thing; for if they had no jurisdiction over the subject matter, then they had no right to touch the subject at all, and could not make a lawful decision either way; and if they had jurisdiction over the subject matter, so that they might lawfully make a decision either way, then it is a case, according to all the authorities, where this court will not hold their decision to be null and void, although admitted to be erroneous when raised collaterally.

The only ground which I have heard suggested for denying the jurisdiction of the Orphans Court is, that it does not appear that the person claiming to be the guardian was such. It certainly does not appear that he was not; and the reasons for insisting that he was not are—first, because no such appointment is found on the records of the Orphans Court; and secondly, because the father could not be the guardian for such a purpose without an appointment, if he could be at all.

It was probably a useless effort to search the records of the Orphans Court for such an appointment, as it is supposed that that court at that time had no such appointing power. They had something to do in such cases, but were not required to make a record of it; but their proceedings being certified to the Ordinary, he issued the letters of guardianship; consequently the finding of no such record can amount to nothing.

In 1820, the power of the Ordinary to appoint guardians was transferred to the Orphans Courts of the counties, and yet, in 1824, Chancellor Williamson is said to have held, that the power of the Orphans Court in the appointment of guardians was confined to appointments for *orphan* children; that an orphan was one who was fatherless, and consequently that the *Orphans Court* could not appoint a guardian for a

minor child while his father was living; but he did not de-
cide, so far as we can learn, that such minor child could not
have a guardian, so far at least as his property was con-
cerned, nor that the father could not be such guardian.  So
far as the guardianship and control of the *person* of a minor
was concerned, unquestionably the father was the natural
guardian: no other was needed, and no stranger could well ·
be appointed to that office consistently with the relationship
existing between parent and child; but so far as the estate
of the minor was concerned, the case was entirely different.
The father, to be sure, was bound to support his minor chil-
dren; but the father might be a beggar, with a large family
of children, each of whom might have sufficient property,
received by devise, grant, or otherwise, to support and edu-
cate them; but without the use of this property, which
might be, like that now before us, not subject to their imme-
diate use, they must grow up in ignorance and pauperism,
for the father, as such, cannot touch this property; he has
no control over it, nor could the Ordinary or the Orphans
Court aid him in the disposition of it.  A guardian must be
appointed, and he, and he only, under the control of the
proper court, can dispose of it, whether there be much or
little, and thereby appropriate it for the proper and neces-
sary maintenance and education of the children during their
minority.  That such a guardian might have been created
for such a purpose at the time of making the order before us;
that such guardian might have been the father of the chil-
dren, and that under an order of the Orphans Court he might
lawfully have sold their real estate, or so much as was neces-
sary for their maintenance and education, does not seem to
admit of a doubt.

The Orphans Court, in their order, recognized this father
as the guardian of his children; they called him guardian,
and they treated him as guardian, but how he became such
they did not insert in their order, nor was it necessary for
them to do so; nor have they inserted the evidence by
which his guardianship was manifested to them, nor was it

necessary for them to do so. The court say that their order was made on full examination. The evidence on which they made that examination was before them; it is not before us, and it is neither our duty nor our right to attempt to determine in this way that the evidence on which they acted was insufficient, or that their decision was unwise or even illegal in itself, and ought to be reversed. This is the very inquiry which all the decisions declare we have no right to make.

In the case of *Voorhees* v. *The Bank of the United States,*. 10 *Peters* 472, in an opinion of immense power and force, in which this same kind of question was before the Supreme Court of the United States, Judge Baldwin, among other things, says: that " the defendants, in resting their case on the only position which the record leaves them, necessarily affirm the general proposition, that a sale by order of a court of competent jurisdiction may be declared a nullity in a collateral action, if their record does not show *affirmatively* the *evidence*. of a compliance with the terms presented by law in making such sale. We cannot hesitate in giving a distinct and unqualified negative to this proposition, both on principle and authority too long and too well settled to be questioned." That is the case here; it is sought to go behind the order of the court, to see if it complied with the terms prescribed by law in making such sale. Nay, we are called to go much further, and say that the evidence on which they acted in making the order, although we do not know what it was, was insufficient to make their determination strictly legal.

This language of Judge Baldwin, with more of the kind, is quoted by Chief Justice Green, in the case of *Stokes* v. *Middleton,* 4 *Dutcher* 32, with high approval; and he does so, he says, because it meets all the objections which had been urged against the plaintiff's title in that case. " Thus (he says) it is urged that there is no proof that there was an application for partition, or that the land could not be divided, or of any order of sale. But there is a recital of those facts in the order of confirmation, and an express adjudication

approving the sale and directing conveyances to be executed. The approval and confirmation of the sale became a part of the record, which thenceforth *proves itself* without referring to the evidence on which it has been adjudged." If these authorities do not cover the case before us, I know not what will.

The statute contemplates at least three different kinds of guardians. There is no reason why the father may not have become such guardian in some one of the ways referred to. It does not appear that he was not. That was a proper question for the Orphans Court to investigate and decide. The presumption is that they did so. They say they did, and that he was. The order in this respect is perfect. In the language, then, just quoted, it now proves itself without referring even to the evidence on which it was adjudicated.

Having reached the conclusion that this order of the Orphans Court is valid and binding upon us, and that the purchaser under it took a good legal title to the premises sold, while the verdict of the jury is destructive of that title, it becomes necessary to inquire whether anything occurred at the trial to which exception was taken, and on which error has been assigned, to render that verdict unlawful.

The plaintiffs, in reply to the proceedings in the Orphans Court, and the deed made in pursuance thereof, allege fraud in the proceedings on the part of the guardian, such as should vitiate the deed, and render void the sale, even in the hands of the present owner. The defendant's counsel asked the court to charge the jury that there was no evidence before them from which they could infer fraud, especially against the present purchaser. This the court refused to do, but charged directly to the contrary, that there was evidence from which they could infer such fraud as would render void the sale by the guardian; that Holsman stood in no better situation than Doremus did; that they had a right to look at the fact, that the deeds of Doremus and Ryerson were of the same date; that they had a right to look at the guardian's account, as filed in the Orphans Court, and at Doremus' poverty, as an inducement for fraudulent conduct. I

am forced to think that much, if not all of this charge is-
erroneous.   There was no evidence of fraud on the part of
Holsman, or of his knowledge of any on the part of Doremus,.
the guardian, which could justify the jury in finding a ver-
dict against his title on that ground.   He obtained his title
some two or three years after the sale by Doremus, and then
at sheriff's sale under the foreclosure of a mortgage.   It does-
not appear that he ever saw Doremus, or that he had ever-
heard even a whisper, that there had been anything unfair-
or dishonest in the transaction.   It is not pretended that the-
property was sold at too low a price.   Judge Dickerson says-
it was a fair price; and if the purchase money had been put
at compound interest, from the time of sale to the death of the-
tenants for life, it would have been more than ten times that
amount.

Whatever Doremus may have known or intended, there is-
no particle of evidence that Holsman had any knowledge or-
notice that there had been anything wrong, except so far as-
he could learn it from the public records.   The jury were-
charged, that they might, as evidence of Holsman's know-
ledge of fraud, take into consideration the account which
Doremus had filed as the basis of his application.   In this,.
I think, he was wrong.   That account had been before the
Orphans Court, and had been passed on by them.   This that
court had an undoubted right to do; and as he had never-
heard the *bona fides* of their ansaction called in question, that
account cannot be considered as evidence, to him, to the con-
trary.   Nor does the account, upon its face, show to a stranger-
anything necessarily fraudulent, or from which he was bound.
to infer it.   The guardian simply charges each of his children
a dollar per week for their board, clothing, and education,.
which, if he had a right to charge them at all, cannot be con-
sidered in itself extravagant or unreasonable.

The jury were also charged, that they might, as evidence
of fraud against Holsman, take into consideration that the-
deeds from Doremus to Ryerson, and from him back to Do-
remus, bore date on the same day.   I am aware that such a.

fact has been held a kind of legal fraud in courts of equity, but I cannot agree that that mere fact in a court of law, as against a stranger who knew nothing of the transaction, is to be considered as *per se* evidence of fraud. If the parties in such cases intended fraud, they would probably do the thing differently; and I think that all experience shows that at least nine of the cases out of ten, when such occurrences have taken place, have been the result of benevolent and friendly feelings towards the persons whose lands were thus sold, and done for their benefit and interest, and not to their disadvantage; so that no legal conclusion can fairly be drawn that such transactions are of themselves evidence of fraud. It is not evidence of *fraud* in courts of equity, although by a strange use of language it has been so termed. The truth is, that when an executor, guardian, or trustee sells the lands of his *cestui que trust,* and becomes the purchaser himself, either directly or indirectly, the courts of equity, who have these matters peculiarly within their province, hold him to have acted still as a trustee in the matter, and will compel him to account to his *cestui que trust,* so as not to turn the transaction to his own advantage.

The jury were also charged, that Doremus' poverty might be taken into consideration as against Holsman as the evidence of fraud. In the first place, there is no evidence whatever that Holsman had any knowledge of the poverty of Doremus; and if he had, I could never consent that it shall become established as a principle of law, that poverty is evidence of dishonesty or corruption. It may be considered as evidence of the necessity under which Doremus was, which led him to pursue the course he did, but cannot of itself be considered as evidence of fraud.

I do not question the right of the courts of law to investigate questions of fraud in certain cases, nor of an heir at law to institute an action of ejectment to recover the lands of his deceased ancestor; but I think, nevertheless, that in all that class of cases where such lands have been sold under an order of a court of competent jurisdiction, in any of the

forms in which such proceeding can lawfully take place, and when the heir, or his assignee, with such proceedings on the public records, intends to assail them on the ground of fraud or other defect, and to set them aside, and establish his title in defiance of them, he should be compelled to do so in a court of equity : for it generally, perhaps invariably, happens that the purchasers at such sales, even when it is the trustee himself, has paid a consideration, perhaps a full and honest one, and has equities that ought to be fairly adjusted if he cannot hold the lands.   These equities the Court of Chancery has full and complete power to arrange according to what is just and right; but the courts of law, it is well known, can do no such thing, but are perfectly powerless in the matter.   All they can do is to strip the purchaser of his lands, no matter how much he may have paid for them, for the benefit of the heir, if the action is sustained at all, and then leave him without redress, unless he, in turn, betakes himself, through a multiplicity of suits, to a court of equity in pursuit of the justice which could easily have been administered to both parties, if the proceedings had been at first commenced in that court.

*For affirmance*—Judges COMBS, CORNELISON, ELMER. FORT, GREEN, HAINES, KENNEDY, WALES, WOOD—9.

*For reversal*—VAN DYKE.